UNITED STATES STEEL CORPORA-
TION, a Delaware Corporation,
Plaintiff,

v.

UNITED MINE WORKERS OF AMERI-
CA et al., Defendants.

Civ. A. No. 71-561.

United States District Court,
W. D. Pennsylvania.

May 7, 1975.

**346**

James H. McConomy, Reed Smith Shaw & McClay, Pittsburgh, Pa., for plaintiff.

Melvin P. Stein, Kuhn, Engle, Blair & Stein, Pittsburgh, Pa., for defendants.

## MEMORANDUM ON JURISDICTIONAL QUESTION

SNYDER, District Judge.

The parties have submitted for determination the matter of this Court's jurisdiction over United States Steel Corporation's (Steel) Claim for damages and the United Mine Workers' (UMW) Counterclaim for wages and fringe benefits lost by its members, as a result of two work stoppages which were trig-

gered by the June 1971 Strike at the Gateway Mine in Greene County, Pennsylvania, a mine neither owned nor operated by Steel. The miners were off work a total of seven days until ordered back by the District Court.

The Third Circuit Court of Appeals reversed the Order of the District Court, but the Circuit's Order was then vacated by the Supreme Court of the United States which remanded the cause for further consideration in light of Gateway Coal Company v. Mine Workers, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). The Circuit thereupon affirmed the judgment of the District Court, and upon return of the record to this Court UMW was given leave to answer the Complaint, and also to file a Counterclaim, to which Steel filed a Reply.

Briefly stated, the pertinent facts are not in dispute that at approximately 12:01 A.M. on June 14, 1971, the members of Local 1248 and District 5 engaged in a work stoppage at Steel's Maple Creek No. 1 and No. 2 Mines, when they refused to cross a picket line established by members of District 4 from the Gateway Mine. Also, about 12:01 A.M. on June 15, 1971, the Gateway Miners similarly established picket lines at Steel's Robena Nos. 2, 3, and 4 Mines and related facilities in Washington County, Pennsylvania. As at Maple Creek, the employee-members of District 4 and Local 6321 at the Robena Mines, acting in sympathy with the Gateway Miners, refused to cross the picket lines and report for work.

The initial Restraining Order was issued by Judge Barron P. McCune of this Court on June 16, 1971, and enjoined the work stoppages at Maple Creek and Robena, and the miners returned to work at their respective places of employment at 12:01 A.M. on June 17, 1971.[1]

---

1. On June 18, 1971, Judge McCune also issued a Temporary Restraining Order in Gateway Coal Co. v. United Mine Workers at Civil Action 71–567, enjoining stoppage of work at Gateway and providing, *inter alia*, that the two Assistant Mine Foremen alleged to be unsafe by the Gateway Miners be suspended until an impartial umpire determined the question of whether the mine was rendered unsafe by the presence of these two men as Supervisors in the mine.

On June 19, 1971, Paul Smorada, an Assistant Foreman at the Maple Creek Mine, was accused of performing his duties in an unsafe manner. At approximately 4:00 P.M. on June 22, 1971, the employee-members of Local 1248 engaged in a work stoppage when the Mine Superintendent refused to remove Smorada as a section boss. This stoppage was terminated about 8:00 A.M. on June 23, 1971, but commenced again on July 13, 1971, at 7:00 A.M., after a vacation period. This second work stoppage was ended by a Temporary Restraining Order and the miners returned to work at 12:01 A.M. on July 16, 1971.

The Collective Bargaining Agreement governing the matters here at issue, was entered into between the Bituminous Coal Operators' Association and the United Mine Workers of America and is entitled the National Bituminous Coal Wage Agreement of 1968 (1968 Agreement), and was effective from October 1, 1968 to September 30, 1971.

It is Steel's position that the 1968 Agreement does not require it to process claims for damages through the Settlement of Local and District Disputes procedures of the 1968 Agreement, (Addendum 1 hereto), and that, thus, the Court in this proceeding has jurisdiction to award damages in addition to granting an injunction. Steel also takes the position that the UMW's Counterclaim, involving wages, fringe benefits, and royalties lost by the Welfare and Retirement Fund, must be arbitrated under the broad language of the 1968 Agreement.

The Defendants contend, to the contrary, that Steel, having brought this action and selected the forum, must submit itself to the jurisdiction of the Court with respect to what they allege is the compulsory counterclaim filed in the action. They argue that ancillary jurisdiction attaches to the counterclaim in order that the parties may adjudicate the controversy in its entirety in a single forum.

In the recent case of Island Creek Coal Co. v. United Mine Workers, 507 F.2d 650 (3d Cir. 1975), the District Court granted a preliminary injunction pending arbitration in a dispute between Island Creek Coal and Local No. 998 of the United Mine Workers of America. Island Creek Coal operated Bird Nos. 2 and 3 Mines in Somerset County, Pennsylvania, and employed members of Local 998. In April of 1974, a work stoppage occurred at Florence Mining Company No. 2 Mine, whose employees belonged to Local No. 680 of the United Mine Workers. On April 11, 1974, twenty to twenty-five men, not employed at Island Creek and not members of Local 998, picketed Bird No. 2 and No. 3 Mines, and the employees of those mines declined to cross the picket lines. Island Creek Coal sought an injunction, which was granted and the action affirmed in the Third Circuit. Judge Gibbons had the following to say with respect to the 1968 Agreement (507 F.2d at 651):

"The settlement of disputes provisions of the National Bituminous Coal Wage Agreement of 1971 are virtually identical with the settlement of disputes provisions of the 1968 Agreement which was construed by the Supreme Court in Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). The key provisions are Article XVII, § (b):

'Should differences arise between the Mine Workers and the Employer as to the meaning and application of the provisions of this agreement, or should differences arise about matters not specifically mentioned in the agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences at the earliest practicable time.' (Appendix at 4a).

and Article XX:

'The United Mine Workers of America and the Employers agree and affirm that they will maintain

the integrity of this contract and that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the "Settlement of Disputes" article of this agreement . . ..' (Appendix at 6a)

In *Gateway* the Supreme Court held that the 1968 Agreement implied a no strike obligation co-terminus with the grievance-arbitration provisions, 414 U.S. at 381–382, 94 S.Ct. 629, and that the language 'any local trouble of any kind aris[ing] at the mine' was to be read broadly to encompass even disputes over mine safety. *Id.* at 376, 94 S.Ct. at 636. If the underlying dispute falls within the scope of the grievance-arbitration clause, then, on the authority of *Gateway* the order appealed from must be affirmed. The Seventh Circuit, considering the same contract as is before us, and in the same context of a dispute over the employees' duty to cross a stranger picket line, held that injunctive relief was proper. Inland Steel Company v. Local 1545, UMW, 505 F.2d 293 (7th Cir. 1974). Judge Fairchild dissented, referring to the analysis made by Judge Hunter in his dissenting opinion in NAPA Pittsburgh, Inc. v. Automotive Chauffeurs, 502 F.2d 321, 324 (3d Cir.), *cert. denied,* 419 U.S. 1040, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974)."

The Court then went on to say (507 F.2d 652–653):

"In making this initial inquiry, in the context of the employees' refusal to cross a stranger picket line, the starting point is the recognized principle that a union man's honoring of a lawful stranger picket line is protected activity. The right to engage in that protected activity may, however, be bargained away by the collective decision of his union. NLRB v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953). In the *Rockaway News* case the collective bargaining agreement contained an express no strike clause but no specific reference to honoring picket lines. An employee truck driver refused to make a pick-up at a plant the employees of which were on strike, and was discharged. His union grieved his discharge through arbitration and the arbitrator decided in favor of the employer. The discharged employee then filed an unfair labor practice charge with the National Labor Relations Board, contending that he was discharged for engaging in protected activity. The Board, recognizing that the right to honor lawful stranger picket lines could be and had been bargained away, held that the contract was void because it contained an unlawful maintenance of membership clause. Thus it sustained the unfair labor practice charge. The Supreme Court reversed, holding that the no strike and arbitration clauses were separable from the maintenance of membership clause, and that the arbitrator's decision was binding. 345 U.S. at 81, 73 S.Ct. 519. *Rockaway News,* is authority for the proposition that the question whether the right to honor a stranger picket line has been bargained away may be an arbitrable question. We ask, then, if Island Creek had discharged its employees who in this instance refused to cross a stranger-picket line, could the union have grieved their discharge under the settlement of disputes provisions of the instant contract?

We grant that the answer is not as clear in this case as in a case where the contract contains an express no strike clause as in *Rockaway News* or an express reference to picket lines, or, as in *NAPA Pittsburgh,* both. Nevertheless we conclude that under the settlement of disputes provisions of this contract the union could have grieved and arbitrated a discharge of its members for refusing to cross a picket line. The contract covers not only all matters dealt with specifically but also 'matters not specifically mentioned.' Art. XVII, § (b). It pro-

vides that 'all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the "Settlement of Disputes" article . . .' Art. XX. These clauses are broad enough to confer on the arbitrator jurisdiction to resolve disputes over matters which were not specifically resolved in the collective bargaining process, including the matter of the members' right to honor stranger picket lines. This result may superficially seem inconsistent with the philosophy of collective bargaining, since it recognizes a substantial jurisdiction in the grievance-arbitration process to fill in the interstices of the collective bargaining agreement. *See* United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 580, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). The apparent inconsistency is only superficial, however, since the settlement of disputes provisions were bargained for and the parties have undertaken to live by them during the term of the contract. The result is consistent, moreover, with the presumption of arbitrability laid down by the Supreme Court.

'An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.' Gateway Coal Co. v. United Mine Workers, *supra,* 414 U.S. at 377–378, 94 S.Ct. at 637 (quoting from United Steelworkers of America v. Warrior & Gulf Navigation Co., *supra,* 363 U.S. at 582–583, 80 S.Ct. 1347).

It will undoubtedly be urged that by starting with the question whether the union could grieve a discharge for refusing to cross a picket line we have predicated our analysis upon a different dispute than that before us, since in the discharge case the discharge itself is the dispute. There is, however, no meaningful distinction. In the discharge case the arbitrator would be required to determine whether or not the union has bargained away its members' right to honor stranger picket lines. If he has jurisdiction to make such a determination that jurisdiction is equally available to the employer. To make a distinction which would in effect force the employer to discharge employees in order to bring the settlement of disputes provisions into operation would be counter-productive of the intended purpose of the provisions and of the national policy favoring settlement of industrial disputes by peaceful means.

Since we conclude that the dispute over whether the union has contracted away its members' right to honor stranger picket lines is an arbitrable dispute, it follows from *Gateway* that the injunction appealed from was in this case properly issued."

Thus, the equity jurisdiction of the District Court is firmly established under the doctrine set forth in *Gateway, NAPA Pittsburgh,* and *Island Creek Coal Co.* We have then examined our situation to see if there is any reason for not following the usual approach that equitable proceedings can provide full and adequate relief.

We are not without precedent in this Circuit: In Boeing Co. v. International Union, U. A., A. & A. Imp. Wkrs., 370 F.2d 969 (3d Cir. 1967), an action was brought by an employer for damages under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, alleging that the defendant unions had engaged in a work stoppage in violation of a no-strike clause. The defendant moved to dismiss the Complaint, and for Summary Judgment, or alternatively for stay of the action pending arbitration. The Court held (370 F.2d at 970):

"The only question for decision is whether the issues of the instant litigation were referable to arbitration. Since the obligation to submit a controversy to arbitration is wholly con-

tractual, the answer depends upon the proper interpretation of the relevant provisions of the collective bargaining agreement. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962). If the said issues were arbitrable under the terms and conditions of the contract, the denial of a stay was improper.

We recognize at the outset that arbitration clauses, such as those usually contained in labor-management contracts, should be so construed as to effectuate congressional policy favoring the settlement of labor disputes. It was held in United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960): 'An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' Despite this liberal rule of construction a reluctant party may not be compelled to submit a controversy to arbitration unless under a fair construction of the agreement he is bound to do so. Atkinson v. Sinclair Refining Co., *supra*; Retail Clerks International Association, etc. v. Lion Dry Goods, Inc., 341 F.2d 715, 719–720 (6th Cir. 1965), cert. den. 382 U.S. 839, 86 S.Ct. 87, 15 L.Ed.2d 81; Kansas City Luggage & Nov. Wkrs. U., etc. v. Neevel Luggage Mfg. Co., 325 F.2d 992, 994 (8th Cir. 1965). Absent a contractual obligation to the contrary, a reluctant party is free to pursue any available legal remedy to redress its grievances. Ibid."

In Firestone Tire & Rubber Co. v. International Union, etc., 476 F.2d 603 (5th Cir. 1973), there was an action by an employer against a union and a local for injunctive relief and damages for violation of the no-strike clause of the collective bargaining agreement. The union moved for a stay pending arbitration, which was denied by the District Court and the union was enjoined from pursuing any actions or proceedings arising out of contract breach which was at issue, and the union appealed that ruling. In a *per curiam* opinion, the Court stated (476 F.2d at 605–606):

"As the district court properly recognized,

'First, there is a strong national policy favoring labor arbitration and an order to arbitrate pursuant to an arbitration clause should not be denied unless it may be said with "positive assurance" that the arbitration clause does not reach the dispute in question. United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).'

The basis of arbitration is, however, contractual and unless the parties have provided for arbitration in the collective bargaining agreement, the court is powerless to compel arbitration. Numerous cases have held that breaches of a no-strike clause are not subject to arbitration where (1) the grievance provisions of the agreement neither explicitly nor implicitly provide for such arbitration, and (2) the contractual grievance machinery is wholly employee oriented. *E. g.*, Atkinson v. Sinclair Refining Co., 1962, 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462; G. T. Schjeldahl Co., Packaging Machinery Division v. Local 1680, IAM, 1 Cir. 1968, 393 F.2d 502; Boeing Co. v. International Union, 3 Cir. 1967, 370 F.2d 969. The district court correctly applied this principle to the instant contract, and we affirm its finding that the company was not obligated to seek arbitration of the no-strike breach."

In interpreting a similar provision, our Circuit in accord stated as follows (Affiliated Food Distributors, Inc. v. Local Union No. 229, 483 F.2d 418 (3d Cir. 1973) at 420):

"The principle that doubt should be resolved in favor of arbitration does not relieve a court of the responsibili-

ty of applying traditional principles of contract interpretation in an effort to ascertain the intention of the contracting parties. When a contract, fairly read with these principles in mind, is susceptible of a construction that dictates arbitration, the congressional policy favoring that form of dispute resolution may require the denial of judicial relief despite the possibility of fairly reading the contract to evidence a contrary intent. But, there is no occasion to resort to this congressional policy in a case where the contract, fairly read as a whole, is not susceptible of a construction that the parties bound themselves to arbitrate the dispute before the court. We conclude that this is such a case." [footnotes omitted].

Our analysis of the arbitration clause here fails to disclose any statement by the parties that claims for damages in a proceeding such as this are to be subject to arbitration.

Under "Settlement of Local and District Disputes" of the 1968 Agreement, there is reference to "differences" concerning "any local trouble of any kind [which may] arise at the mine", and the aggrieved party and mine management are given authority thereunder to settle the complaint. However, it goes on to state if no agreement is reached, the matter shall then be taken to an umpire.

It seems clear to this Court that the contract here, that is the 1968 Agreement, fairly read as a whole, is not susceptible of the construction requiring arbitration of the issue of damages or the counterclaim therefor in a proceeding of this nature. *Cf.* Blue Diamond Coal Co. v. United Mine Workers of America, 436 F.2d 551 (6th Cir. 1970), cert. denied, 402 U.S. 930, 91 S.Ct. 1525, 28 L.Ed.2d 863 and Consolidation Coal Co. v. United Mine Wkrs., Loc. U. No. 6869, 362 F. Supp. 1073 (S.D.W.Va.1973) (involving damage claims under various national bituminous coal wage agreements which necessarily implied jurisdiction in the federal courts to hear such matters without arbitration).

Treating the agreed submissions of the jurisdictional question as Motions by both parties to dismiss for lack of jurisdiction, the Motions are denied.

## SETTLEMENT OF LOCAL AND DISTRICT DISPUTES

Should differences arise between the Mine Workers and the operators as to the meaning and application of the provisions of this agreement, or should differences arise about matters not specifically mentioned in this agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences immediately: (The parties will not be represented by legal counsel at any of the steps below.)

1. Between the aggrieved party and the mine management.

2. Through the management of the mine and the mine committee.

3. Through district representatives of the United Mine Workers of America and a commissioner representative (where employed) of the coal company.

4. By a board consisting of four members, two of whom shall be designated by the Mine Workers and two by the operators. Neither the Mine Workers' representatives on the board nor the operators' representatives on the board shall be the same persons who participated in steps (1), (2), or (3) of this procedure.

5. Should the board fail to agree the matter shall, within twenty (20) days after decision by the board, be referred to an umpire to be mutually agreed upon by the operator or operators affected and by the duly designated representatives of the United Mine Workers of America, and the umpire so agreed upon shall expeditiously and without delay decide said case. The decision of the umpire shall be final. Expenses and salary incident to the services of an umpire shall be paid equally by the operator or

operators affected and by the Mine Workers.

A decision reached at any stage of the proceedings above outlined shall be binding on both parties hereto and shall not be subject to reopening by any other party or branch of either association except by mutual agreement.